Harry E. SINGLETON, as next friend
of Christine Ann Singleton, a minor,
et al., Plaintiffs,

v.

INTERNATIONAL DAIRY QUEEN,
INC., et al., Defendants.

Superior Court of Delaware,
New Castle.

Jan. 8, 1975.

Leonard L. Williams, Wilmington, for plaintiffs.

Gary W. Aber, of Biggs & Battaglia, Wilmington, for defendant, International Dairy Queen, Inc.

B. Wilson Redfearn of Tybout, Redfearn & Schnee, Attorney for Defendant, W. R. Hesseltine.

Alfred M. Isaacs of Flanzer & Isaacs, Wilmington, for defendant, Blue Hen Glass Company, Inc.

Morton R. Kimmel of Kimmel, Spiller & Bradley, Wilmington, for defendant, Joseph Byler.

## OPINION ON MOTION OF DEFENDANT, INTERNATIONAL DAIRY QUEEN, INC., FOR SUMMARY JUDGMENT

LONGOBARDI, Judge.

This is the decision on Defendant's, International Dairy Queen, Inc., ("Dairy Queen") motion for summary judgment.

On July 31, 1971, a nine year old girl ("Plaintiff") fell through a glass door of a franchised Dairy Queen operation located at 813 Chestnut Road, Newark, Delaware. The store was owned by W. R. Hesseltine ("Hesseltine"). After purchasing cones of ice cream, the Plaintiff proceeded to the east door of the establishment and apparently without touching the glass, but by pushing on a metal crossbar designed for the purpose of receiving some force to open the door, attempted to leave. The bottom part of the glass cracked and fell outward and the Plaintiff, by reason of her forward motion, fell through the door and onto the cracked glass suffering lacerations and other injuries.

Hesseltine had remodeled these premises during 1971 and had engaged the services of Joseph Byler ("Byler") as a general contractor. Byler subcontracted the glass work to Blue Hen Glass Company, Inc. ("Blue Hen"). Under the terms of the franchise agreement, Hesseltine was required to construct his premises in "accordance with the plans furnished" by the franchisor, International Dairy Queen, Inc. At the request of Hesseltine, Dairy Queen forwarded plans and specifications to him. Hesseltine forwarded these plans to his personal architect, Walpole, and at this stage there still is no agreement whether the Dairy Queen plans survived modification. In any event, they were the basis for Walpole's plans and the remodeling project. In addition to the requirement that any structure had to be built according to Dairy Queen's plans, the franchise agreement also contains the following pertinent conditions:

(a) Dairy Queen imposes "rules and controls" for the "conduct of the Dairy Queen business";

(b) Dairy Queen has the right to inspect the premises;

(c) The "mix" formulas are subject to Dairy Queen's regulation;

(d) The franchise agreement cannot be assigned without prior approval;

(e) Only the words "Dairy Queen" are to be displayed as the trade name of the store;

(f) Dairy Queen reserves the right to inspect the premises for the purpose of

quality control of the product "and the conditions of manufacture or sale thereof";

(g) Suppliers of "mix" have to be approved by Dairy Queen. All other products have to be purchased from Dairy Queen's approved suppliers;

(h) Dairy Queen requires the store be kept in a "high state of repair";

(i) All employees have to wear uniforms approved by Dairy Queen;

(j) All advertising cartons and containers used in the business must be marked to indicate they are being used under the authority of Dairy Queen;

(k) Freezers must be purchased from "authorized" manufacturers;

(l) Dairy Queen dictates portion control which can vary from time to time as they see fit;

(m) All freezers used on the premises must have a name plate containing only the name "Dairy Queen";

(n) Dairy Queen reserves the right to dictate what additional items may be sold besides the dairy product from the freezer;

(o) The franchisee must keep records and make monthly reports on the number of gallons of mix, from whom they were purchased and the date the mix was received;

(p) Dairy Queen has the right to cancel the franchise agreement for many reasons, not the least of which is the franchisee's failure to meet the requirements proposed by Dairy Queen for the "physical properties";

(q) Dairy Queen renounces liability or responsibility for the "business operations" of the franchisee.

One of Defendant's arguments in support of its motion for summary judgment is that Hesseltine is an independent contractor over whom Dairy Queen exercises no "continual or actual" control of the day to day operations. The other argument of the Defendant goes towards illustrating the absence of negligence. In particular, the argument alleges that the plans provided Hesseltine contain specifications on a door which meets industry standards.

The question now is whether the Defendant, Dairy Queen, the moving party, has met its burden of demonstrating that there is no issue of fact which, resolved in favor of Plaintiff, would hold the Defendant liable. Howard v. Food Fair Stores, New Castle, Inc., Del.Supr., 201 A.2d 638 (1964), affirmed 212 A.2d 405 (1965); McGahey v. Swinehart, Del.Super., 267 A. 2d 469 (1970). Construing the facts in this record in the light most favorable to the Plaintiff, the Court concludes the Defendant has failed to carry its burden.

Private franchising, the multi-billion dollar entrepreneurial goliath, thrives so long as it can maintain control of its service, product and trade name. The franchise agreement attests to the skill of corporate counsel in reserving as many rights as is possible to maintain control and to protect the product or service covered by the trademark. The necessity to maintain control for the purpose of protecting its product, service, know-how and name, however, may also result in a master-servant relationship wherein the franchisor becomes liable for the torts of the franchisee 62 Am.Jur.2d 772. Some authorities have decided that when the control becomes excessive, the borderline is breached and a master-servant relationship is created. Nichols v. Arthur Murray, Inc., 248 Cal.App.2d 610, 56 Cal.Rptr. 728 (1967).

In the instant case, the control exercised by Dairy Queen appears to be excessive. When an entity can control the size, shape and appearance of its franchisor's establishment, impose the nationally known sign "Dairy Queen" as the only sign for the premises, require all containers to show the

name of the parent company, dictate portion control, the size and shape of containers, the uniforms of the employees, subject the franchisor to the obligation to obey subsequent rules and regulations, reserve the right to inspect the premises (the absence of affirmative remedial controls except termination in the event the inspection results are unsatisfactory proves nothing since what is the right to inspect without the right to remedy), name the suppliers and even dictate what else may be sold on the premises, there appears little else to establish agency. The very lifeblood of the agent is in the hands of the franchisor. What greater control can there be than portion control or the nebulously defined sanction of termination by the unilateral action of the franchisor. Cf. Hoover v. Sun Oil, Del.Super., 212 A.2d 214 (1965). In addition, Hesseltine himself poses the fact issue when he said Dairy Queen did control the day to day operations through their inspections (Hesseltine Deposition, page 80).

■ Though it was never pursued by additional discovery, some question remains as to what he meant by that answer. This is especially so since the franchise agreement renounces responsibility for day to day controls by Dairy Queen. This is a fact issue. The dispute is not resolved merely because the agreement says Dairy Queen is not responsible for the "business operations" of franchisee. The label by which parties to a relationship designate themselves is not controlling. Board of Trade v. Hammond Elevator Co., 198 U.S. 424, 25 S.Ct. 740, 49 L.Ed. 1111 (1904); Pritchard v. Smith (8th Cir. 1961), 289 F. 2d 153; McCarty v. King County Medical Service Corp., 26 Wash.2d 660, 175 P.2d 653 (1946); Francis v. Pan American Trinidad Oil Company et al. (D.C.Del. 1973), 59 F.R.D. 631. In addition, the franchise agreement is so broadly drawn it requires additional discovery or testimony at trial to decide what the parties meant

and understood by its terms. Burnett v. Medford (D.C.E.D.Pa.1967), 274 F.Supp. 845; S. J. Groves & Sons Company v. Ohio Turnpike Commission (C.A. 6th 1963), 315 F.2d 235 at 237; United States v. Perry (C.A. 9th 1969), 431 F.2d 1020; Cram v. Sun Insurance Office, Ltd. (C.A. 4th 1967), 375 F.2d 670; Western Geophysical Company of America, Inc. v. Bolt Associates, Inc. (D.C.Conn.1968), 285 F. Supp. 815. These are issues which are best resolved at trial during which the parties are given an opportunity for a full and rigorous examination of the facts. Cf. Raasch v. Dulany et al. (D.C.E.D.Wis. 1967), 273 F.Supp. 1015 at 1019. The existence of a relationship between Dairy Queen and Hesseltine which would impose vicarious liability on Dairy Queen is not decided by this opinion.

■ In addition, there is a fact question as to Hesseltine's being an "apparent" servant or agent of Dairy Queen and whether there was "apparent authority."

■ The concept of "apparent" authority or whether one is the "apparent servant or agent" of another depends on manifestations by one party which lead third parties to believe another is his agent. "This authority is entirely distinct from authority, either express or implied." Re. of Agency 2d. Sect. 8, Comment a. Additionally, one who represents through "apparent authority" that another is his servant and causes a third person to justifiably and reasonably rely upon the care and skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant as if he were such. Re. of Agency 2d. Sect. 267. This concept was recognized in Gizzi v. Texaco, Inc. (C.A. 3rd 1971; reh. den. March 8, 1971), 437 F.2d 308. In that case, Mr. Gizzi, a steady patron of a Texaco service station, became interested in a 1958 Volkswagon Van offered him by the

station operator Hinman. Hinman offered to put the vehicle in good working order. bility of Texaco was that Texaco had After delivery Gizzi became involved in a collision because of the failure of the brakes. He sued Hinman, the station operator and Texaco who owned certain equipment on the premises. The theory of liability of Texaco was that Texaco had clothed Hinman with apparent authority and Gizzi had relied on that authority thinking Texaco would stand behind the repairs. The trial court granted Texaco a directed verdict. The Court of Appeals reversed saying:

> p. 310. "We are of the opinion that the court below erred in granting the motion. Questions of apparent authority are questions of fact and are therefore for the jury to determine."

See also Chevron Oil Company v. Sutton, 85 N.M. 679, 515 P.2d 1283 (1973). It has been recognized in this State most recently by Vanaman v. Milford Hospital, Inc., Del.Supr., 272 A.2d 718 (1970) wherein Justice Duffy for the Supreme Court reversed a decision of the Superior Court granting summary judgment.

Applying those standards to the present case, I find there were sufficient facts which could be the basis of "apparent authority" and the Plaintiff's reliance on that authority could subject Dairy Queen to liability as a principal. Defendant Dairy Queen's motion for summary judgment is denied.

It is so ordered.