ENTERPRISE MANAGEMENT CON-
SULTANTS, INC., An Oklahoma Cor-
poration; John Clark Caldwell, III, Le-
roy Wheeler and Buster F. Wilburn,
Appellants,

v.

The STATE of Oklahoma ex rel. the
OKLAHOMA TAX COMMISSION,
Appellee.

No. 66708.

Supreme Court of Oklahoma.

July 19, 1988.

Rehearing Granted in Part and Denied in
Part Feb. 7, 1989.

David W. Edmonds, Randy Witzke, Messrs. Edmonds, Cole, Hargrave & Givens, Oklahoma City, for appellants.

J. Lawrence Blankenship, General Counsel, Oklahoma Tax Com'n, Robert C. Jenkins, Oklahoma City, for appellee.

OPALA, Justice.

Enterprise Management Consultants, Inc., and its officers and directors [collectively referred to as EMCI] bring this appeal from an Oklahoma Tax Commission [OTC or Commission] order that denied their protest of a sales tax on the revenues from bingo games and food concession sales. EMCI conducted these games pursuant to its contracts with the Citizen Band Potawatomi Tribe of Oklahoma [Tribe] on land held in trust by the United States for the Tribe's benefit.[1] Three issues are presented for our decision: [1] Is EMCI the Tribe's agent and hence immune from liability for the collection and remittance of sales tax on revenues from the bingo and concession activities? [2] Is the imposition of a sales tax on such revenues an unconstitutional infringement upon tribal self-government? and [3] Is a tax on bingo activities on tribal land preempted by federal law? We answer the first question in the negative because EMCI has failed to prove that it was the Tribe's agent in regard to the bingo operation and we deem such question dispositive of this appeal. We, thus, have determined it is unnecessary for us to decide the second and third issues presented and we decline to do so.

## FACTS

EMCI is a non-Indian corporation that conducted bingo games and food concession sales on tribal lands. This operation was governed by three business agreements between the Tribe and EMCI—a management agreement,[2] a lease and a sublease. These agreements state that

---

1. The land was conveyed to the Tribe by Pub.L. 86–701, 74 Stat. 903 [1960]. It was reconveyed to the United States in trust for the Tribe to allow the Tribe to qualify for funding under the Economic Development Act. S.Rep. No. 93–877, 93d Cong., 2d Sess. [1974].

2. The management agreement's *pertinent* provisions include the following text:

   "This AGREEMENT ... by and between the Citizen Band Potawatomi Tribe of Oklahoma ... (hereinafter referred to as PRINCIPAL) ... and Enterprise Management Consultants, Inc. ... (hereinafter referred to as AGENT) ...

   1. *Definitions.*
      \* \* \* \* \* \*
   B. *'Gross Profit from Game Sales'*, as used herein, means all revenues derived from the sale of bingo cards, as well as all revenue derived from any other game or games of chance, less and subtracting therefrom payouts, taxes and bank.
   C. *'Gross Profit from Food Concession Sales'*, as used herein, means all revenue derived from the sale of food items, beverages, souvenirs or of any other merchandise, less and subtracting taxes.
   D. *'Payouts'*, as used herein, means the money value of the prize of the game given, at the conclusion of each game played, to the winning player or players, whether paid in cash or the actual sum paid for merchandise.
   E. *'Bank'*, as used herein, means a sum of money advanced by AGENT for the sole purpose of making change to accommodate customers.
   F. *'Taxes'*, as used herein, means any tax imposed on game or food concession sales or both, including without limitation license fees, permit fees, sales tax, excise tax or any other tax imposed on said operation or the realty by the government of the United States of America, the State of Oklahoma, the City of Shawnee or Pottawatomie County; but, specifically excluding income taxes.
      \* \* \* \* \* \*
   8. *Operating expenses.* AGENT shall be responsible for the payment of all operating expenses incurred with the construction and management of said Bingo and Food Concession Operation, as well as the cost to maintain said building improvements and the contents therein contained, except as to the payment of taxes as hereinabove defined.
      \* \* \* \* \* \*
   11. *Profit to Principal.* PRINCIPAL shall be entitled to thirty-five percent (35%) of Gross Profits from Game Sales and fifteen percent (15%) of Gross Profits from Food Concession Sales.
   12. *Guarantee to PRINCIPAL.* In consideration of such appointment, AGENT guarantees to PRINCIPAL $120,000.00 per annum for the first year of operation which sum is to be paid

EMCI was responsible for the construction and maintenance of the bingo facilities and for the operation of the bingo games. The management agreement referred to the Tribe as "principal" and EMCI as "agent." It guaranteed the Tribe a minimum payment each month, plus a small percentage of the gross profits from the games and food concession revenues.[3] "Gross profits" were to be computed as "less and subtracting taxes."[4] EMCI was responsible for the operating expenses but not the taxes.[5] Taxes defined in this contract were to include state sales tax.[6]

Following OTC's audit of EMCI's records, state and city sales taxes were assessed on unreported sales. EMCI's timely protest was denied initially by an administrative law judge and then by the OTC *en banc*. The OTC determined that EMCI's bingo operation and food concession sales on the tribal land constituted a "sale"[7] and that EMCI was a "vendor"[8] within the meaning of the Oklahoma Sales Tax Code [Code].[9] The Commission based this conclusion upon its findings that EMCI was not the Tribe's agent because the Tribe lacked control over EMCI; EMCI held itself out as operator of the bingo games; and the Tribe received only a small portion of the profits. The OTC also ruled that its assessment on the bingo revenues was a tax imposed on the consumer which is to be collected by the vendor, EMCI.

in advance in monthly installments of $10,000.00 each on or before the first day of each month as an accumulative credit against PRINCIPAL's Gross Profit from Game Sales, whereby in those months that said AGENT'S guarantee exceeds PRINCIPAL'S Gross Profit from Game Sales, such excess will be credited on behalf of AGENT against those months when said PRINCIPAL'S Gross Profit from Game Sales exceeds said AGENT'S monthly guarantee. Said adjustment, if any, shall be accomplished at the end of the first year, and shall not exceed $10,000.00. Further and in the event PRINCIPAL'S monthly Gross Profit from Game Sales for any given month exceeds said AGENT'S guarantee, then, AGENT shall disburse to PRINCIPAL such excess on or before the 15th day of the following month. During the second year and thereafter, said guarantee shall be $10,000.00 per month, payable in advance on the first day of the month, or PRINCIPAL'S Gross Profit participation, as set forth in paragraph 11 hereof, whichever is greater. Further, should PRINCIPAL'S Gross Profit participation be greater, then such excess above the monthly guarantee shall be disbursed to PRINCIPAL on or before the 15th day of the following month. In addition, said AGENTS first monthly guaranteed payment shall be paid on or before the Commencement Date....

\* \* \* \* \* \*

18. *License Fee.* In addition other sums due hereunder, AGENT shall purchase from PRINCIPAL an Annual License, at a cost not to exceed $100.00, which permits AGENT to conduct said Bingo and Food Concession Operation, according to the proposed Regulations of PRINCIPAL.

19. *Counting of Gross Receipts.* Counting of Gross Receipts resulting from said Bingo and Food Concession Operation shall be jointly done on a daily basis at the close of business by representatives of both PRINCIPAL and AGENT. Said counting agents of both PRIN-CIPAL and AGENT shall agree, in writing, prior to their employment, to submit to a polygraph test as required by PRINCIPAL AND AGENT, the cost of which shall be shared by the parties hereto on an equal basis.

20. *Accounting Records.* AGENT shall maintain accounting records of said Bingo and Food Concession Operation in accordance with accepted accounting methods. Said accounting records shall be kept at AGENT'S principal office, and PRINCIPAL shall have, upon five (5) days advance written notice, the right to inspect and examine said accounting records during normal business hours. Such right may be exercised through an agent, employee or independent certified public accountant designated by PRINCIPAL, all at PRINCIPAL'S sole cost. \* \* \* "

3. See paragraphs 11 and 12 of the Management Agreement, *supra* note 2.

4. See paragraphs 1(B) and (C) of the Management Agreement, *supra* note 2.

5. See paragraph 8 of the Management Agreement, *supra* note 2.

6. See paragraph 1(F) of the Management Agreement, *supra* note 2.

7. 68 O.S.Supp.1985 §§ 1352(L) and 1354. The 1987 amendment of these sections (Okl.Sess.L. 1987, Ch. 213, § 1 pgs. 1282 and 1289 and Ch. 113, § 16, pg. 438) did not change the pertinent provisions under review in this case.

8. 68 O.S.Supp.1985 §§ 1352(R) and 1361. See footnote 17 *infra* for the pertinent text of §§ 1352(R) and 1361. Section 1352's amendment in 1987 (Okl.Sess.L.1987, Ch. 213, § 1, pgs. 1282 and 1289) did not change the pertinent provisions under review in this case.

9. 68 O.S.1981 §§ 1350 et seq.

## PRINCIPAL/AGENT STATUS

EMCI asserts that it is not liable for the tax because under the terms of the management agreement it is the Tribe's agent in the operation of the bingo games and food concessions. It directs us to various provisions in these agreements to support its theory of agency status. The Commission argues to the contrary that these documents fail to establish EMCI's claimed legal position vis-a-vis the Tribe.

▬▬ The law does not presume an agency status is present. The burden of proving the existence, nature and extent of the agency relationship rests ordinarily upon the party who asserts it.[10] EMCI must not only meet this burden, but, as a protesting taxpayer, it also must sustain the burden of proving the tax assessment was erroneous.[11] Neither of these responsibilities was met here.

▬▬ A written contract which leaves the parties' true status in doubt may not be accepted as conclusive of agency status. Status is determined from the facts and the interaction of the parties—one vis-a-vis the other.[12] If the facts show control by the principal, then agency can be established regardless of the labels attached by the contract.[13] EMCI had an opportunity at the Commission hearings to establish its agency status *dehors* the written arrangements with the tribe but it failed to do so. No testimony was presented at the hearings relating to the parties' conduct. The evidence focused mainly on the three contractual agreements between EMCI and the Tribe.[14] These documents do not establish that the essential characteristics of an agency relationship were present—i.e. that EMCI owed a fiduciary duty to the Tribe and had agreed to be subject to its con-

**10.** *Coe v. Esau,* Okl., 377 P.2d 815, 818 [1963]. In resolving the issue whether a gas station operator is the agent of his lessor, the court held that the law makes no presumption of agency. The burden of proving the existence, nature and extent of the agency relationship rests on the party alleging it. See also, *Sturm v. Green,* Okl., 398 P.2d 799, 804 [1965].

**11.** *Bert Smith Road Mach. Co. v. Okl. Tax Commission,* Okl., 563 P.2d 641, 643 [1977] (the taxpayer who appealed from the sales tax assessment had the burden of proving the property sold came within a statutory exemption from the tax); *Continental Oil Co. v. Okl. State Bd. Etc.,* Okl., 570 P.2d 315, 317 [1977] (the taxpayer had the burden to provide the Board of Equalization with sufficient evidence to determine whether it was entitled to a tax adjustment). See also *Appeal of Billings Community Elevator, Inc.,* Okl., 510 P.2d 953, 956 [1973] (in a district court trial de novo on appeal from a county equalization board's decision, the burden of proof is on the taxpayer who is seeking affirmative relief).

**12.** The labels used in the contracts do not alone determine whether parties litigant stand vis-a-vis one another in a principal-agent relation. The parties' status is revealed by considering the intent and effect of the contractual language in conjunction with the parties' actual conduct. See *Hinson v. Cameron,* Okl., 742 P.2d 549, 557 n. 32 [1987] (a principal/agent relationship is determined by the parties' status which is found from surrounding facts and is not dictated by the contract; in the event of a discrepancy, facts control over contrary contractual language); *Brewer v. Bama Pie, Inc.,* Okl., 390 P.2d 500, 502

[1964] (the status of one who seeks to establish himself as an employee against the contention that he was an independent contractor is not determined from the written contract alone but from all the facts and circumstances presented by the evidence) and *Brown v. Burkett,* Okl., 755 P.2d 650, [1988] (involuntary employer status will not be imputed absent substantive proof that the master-servant relationship exists).

**13.** A central factor in determining the existence of an agency relationship is a right of control vested in the principal. See *Smith v. St. Francis Hosp., Inc.,* Okl.App., 676 P.2d 279, 281 [1983]. In deciding whether an emergency room doctor was an employee/agent of the hospital the appellate court looked to the Restatement (Second) of Agency § 1 to define the principal-agent status as:

"a fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and *subject to his control,* and consent by the other so to act." [Emphasis added.]

*Smith, supra,* at 281. See *Appleby v. Kewanee Oil Company,* 279 F.2d 334, 336 [10th Cir.1960]. The essence of an agency relation is the right of the principal to give directions that the agent is under a duty to obey as long as he remains the agent. The agent should act in the principal's interest and at his control.

**14.** The evidence presented by EMCI was limited to the management agreement, the lease and sublease, two advertising fliers and the Tribe's Constitution.

trol.[15]

In short, the taxpayer/EMCI must bear here a double burden—to establish agency and to demonstrate the tax was erroneous. EMCI did not sustain its onus when it showed merely the contractual arrangements with the Tribe. The writings by themselves fail to establish agency; *they leave the precise legal status in a clouded or inconclusive state.* The contractual arrangements reveal no more than amorphous notions compatible both with franchisor-franchisee or an independent contractor relation. EMCI needed to go one step further and show that the factual interaction revealed an agency relation. This could have been done by demonstrating the Tribe's control in two important areas—control over the finances of the bingo operation and the Tribe's exclusive control of the revenue collected from the bingo and concession sales. Because there is no evidence in this record *dehors* the inconclusive written arrangements to prove EMCI's status as the Tribe's agent, we must hold that EMCI has failed to show that it was the Tribe's agent in the operation of the bingo games and concession sales.[16]

**15.** See discussion in footnote 13 *supra.*

The management agreement between EMCI and the Tribe resembles a franchise agreement in some respects, e.g. a minimum profit is guaranteed to the Tribe and a license is issued by the Tribe to EMCI, *but the contract lacks the detailed assertion of control* which may make a franchise agreement the source of an agency relationship. *Compare Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781, 789 [3d Cir. 1978] (the franchisor retained broad discretionary power to impose upon its franchisee virtually any regulation it desired which raised a potential agency relationship); *Taylor v. Checkrite, Ltd.,* 627 F.Supp. 415, 417 [S.D.Ohio 1986] (the franchisor retained the right to exercise complete control over its franchisee's business operations which created an agency status); *Singleton v. International Dairy Queen, Inc.,* 332 A.2d 160, 163 [Del.Super.Ct.1975] (the franchisor's control over virtually every aspect of its franchisee's business gave rise to possibility of an agency relationship) *with Oberlin v. Marlin American Corp.,* 596 F.2d 1322, 1326–27 [7th Cir.1979] (there was no agency relationship because control was not constant or detailed but limited to a discrete area); *Broock v. Nutri/System, Inc.,* 654 F.Supp. 7, 9 [S.D.Ohio 1986] (agency status was not present where the franchisor had only a one-time veto power over its franchisee rather than a continuing right to control and franchisor's directions were advisory, not mandatory); *Thiokol Chemical Corporation v. Peterson,* 15 Utah 2d 355, 393 P.2d 391, 394 [1964] (agency status is not present where the contract's intent is to require the party to pursue its own course of operation to achieve the end result desired by the second party).

**16.** This controversy is distinguishable from a recent federal court case in which the Indian Tribe and the corporate/manager of the tribe's bingo enterprise sought declaratory and injunctive relief against the State of Oklahoma to prevent enforcement of state bingo regulations and remittance of state sales taxes on bingo activity sales. See *Indian Country, U.S.A. v. Oklahoma Tax Com'n,* 829 F.2d 967 [10th Cir. 1987]. In *Indian Country, U.S.A. both* the Creek Nation and its manager (a non-Indian corporate entity) were parties to the suit. The court found ample evidence in the record to support the conclusion that the bingo operation was a tribal enterprise: (1) the bingo enterprise was "owned, governed and controlled" by the Creek Nation; (2) it was established by the Creek National Council and controlled and supervised by the Muscogee (Creek) Public Gaming Commissioner; (3) the Creek Nation retained ultimate control over the bingo activities; (4) the Creek Nation developed the bingo enterprise for the benefit of the tribe; and (5) there was testimony that the Tribe benefitted in the form of employment. The court concluded that the tribal enterprise was immune from state regulation and that this immunity extended to the non-Indian corporate manager. The court therefore did not need to deal with the issue of whether the non-Indian manager had established an agency relationship vis-a-vis the Tribe. In the present case, we do not have any evidence as to the degree or extent of the Tribe's involvement in the bingo operation. There are only contract provisions and advertising flyers which, at most, indicate the bingo games are to be conducted in the Tribe's name. The contracts do not identify the bingo operation as a tribal enterprise. Furthermore, assuming Justice Kauger is correct in her concurring opinion that the focus on the status of principal-agent is not the controlling factor, but that the focus is on whether the existence of a tribal enterprise is established, and that a tribal enterprise would be exempt from the sales tax assessment in this case under the analysis found in *Indian Country, U.S.A.* or under the recent decision of the United States Supreme Court in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1986) we believe, as with the question of agency, that EMCI failed to prove the operation was a tribal enterprise for the reasons disclosed in that part of Justice Kauger's concurring opinion, which begins with the first full paragraph at page 368, column 1, and ends at the conclusion of the first paragraph in column 2 of that page. Of course, we note that *California v. Cabazon, etc.* would not be directly applicable

■ EMCI also disclaims any liability for the payment of the sales tax because its written agreement with the Tribe releases it from that responsibility. This argument is without merit. The incidence of the tax on revenue from bingo activities cannot be governed by private arrangement; rather, it is exacted by law. People who take funds that are subject to tax are responsible to the government for its payment regardless of any private arrangement to the contrary.[17] The agreements under review do not indicate who is responsible for the payment of taxes; there is merely a provision which attempts to immunize EMCI from that liability.[18] The tax was assessed against EMCI because it was a "vendor" rather than "agent" in the conduct of the bingo games in question and collected the revenues from that activity. There is nothing in the record to indicate that the Tribe had exclusive control of these revenues. In short, because EMCI failed to establish its agency status vis-a-vis the Tribe, it cannot be exonerated by its written agreement with the Tribe from the incidence of the tax which falls as a matter of law. We hence conclude that EMCI has not met its burden of proving that the assessment was erroneously made.

Affirmed.

DOOLIN, C.J., and LAVENDER, SIMMS, KAUGER and SUMMERS, JJ., concur.

HODGES, J., dissents.

HARGRAVE, V.C.J., disqualified.

KAUGER, Justice, with whom OPALA, Justice, joins, concurring:

Perhaps the most basic principle of all Indian law, supported by a host of decisions, is that those powers which are vested in an Indian tribe are not, in general, delegated powers granted by express acts of Congress. Rather, these are inherent powers of a limited sovereignty which have never been extinguished—what is not expressly limited remains within the domain of tribal sovereignty.[1] Native American Tribes, thus, continue to occupy a distinct and unique legal/political status with the federal government of this country, which predates the formation and union of the States. This special relationship, from which states are excluded absent congressional consent, is rooted in the United States Constitution at Article 1, Sec. 8, cl. 3:

"The Congress shall have Power ...; To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;"

Such constitutional power over Indians and their lands, exercised by Congress, has been characterized as plenary, exclusive,

here in regard to its analysis or discussion of the applicability of P.L. 280 primarily for the reason OTC does not rely on that federal statute as its basis for the propriety of taxation here. See Justice Kauger's concurring opinion for a discussion of the history of P.L. 280.

**17.** Section 1361 *infra* of the Oklahoma Sales Tax Code specifically provides that the vendor has the duty to collect and remit the sales tax. This duty cannot be avoided by contrary contract provisions. See *United States v. United States Cartridge Co.*, 198 F.2d 456, 464 [8th Cir.1952]. The pertinent terms of 68 O.S.Supp.1986 § 1361 provide:

"(A) The tax levied by this article shall be paid by the consumer or user to the *vendor as trustee* for and on account of this state. Each and every vendor in this state shall collect from the consumer or user the full amount of the tax levied.... Every person required to collect any tax imposed by this article, and in the case of a corporation, each principal officer thereof, *shall be personally liable for said tax.* * * *" [Emphasis added.]

The definition of "vendor" is found in 68 O.S. Supp.1987 § 1352(R). Its pertinent terms provide:

"'Vendor' shall mean and include:
(1) *Any person making sales of* tangible personal property or *services in this state,* the gross receipts or gross proceeds from which are taxed by this article; * * *." [Emphasis added.]

**18.** See paragraph 8 of the Management Agreement, *supra* note 2.

**1.** F. Cohen, Handbook of Federal Indian Law, Chapter 7, p. 122 (1986); B. Pipestem and G. Rice, "The Mythology of the Oklahoma Indians: A Survey of the Legal Status of Indian Tribes in

and complete.[2] While a tribe by inaction or through inadvertant omission may limit the scope and exercise of its own tribal powers, only Congress can limit modify, eliminate or expand the powers of local self government which tribes otherwise possess. States are without power to do so unless Congress exhibits a clear intention to terminate tribal sovereign immunity within the proscriptions of a particular stated prupose.[3]

Consistent with Congress' plenary role with respect to Indians and their lands, the Enabling Act of the State of Oklahoma in its recitation of the conditions of statehood, prohibits limiting or impairing rights of persons or property associated with Indians. It provides:

"That the inhabitants of all that part of the area of the United States now constituting the Territory of Oklahoma and the Indian Territory, as at present described, may adopt a constitution and become the State of Oklahoma, as hereinafter provided: Provided, that nothing contained in

the said constitution shall be construed to limit or impair the rights of persons of property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property or other rights by treaties, agreement, law or otherwise, which it could have been competent to make if this Act had never passed."

Oklahoma has not amended the Constitution, nor has it complied with the conditions of any federal law to invoke jurisdiction over Indian tribes in contradiction to its Enabling Act.

In 1953, Congress manifested a conditional intent to permit states to assume civil and criminal jurisdiction by the passage of P.L. 280.[4] The Act required some states, including California, Nebraska, Oregon and Wisconsin, to assume mandatory jurisdiction over Indian Tribes.[5] However,

Oklahoma," 6 American Indian L.Rev. 259 (1978).

**2.** *Talton v. Mayes,* 163 U.S. 376, 380, 16 S.Ct. 986, 988, 41 L.Ed. 196–97 (1896).

**3.** *Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 3112, 48 L.Ed.2d 710 (1976).

**4.** *Section 2 of P.L. 280, 18 U.S.C. § 1162 (1953)* provides:
"Sec. 2. Title 18, United States Code, is hereby amended by inserting in chapter 53 thereof immediately after section 1161 a new section, to be designated as section 1162, as follows: § 1162. State jurisdiction over offenses committed by or against Indians in the Indian country
(a) Each of the States listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over offenses committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State:

State of | Indian country affected
California .....All Indian country within the State
Minnesota .....All Indian country within the State except the Red Lake Reservation
Nebraska ......All Indian country within the State

Oregon ........All Indian country within the State, except the Warm Springs Reservation
Wisconsin .....All Indian country within the State, except the Menominee Reservation

(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.
(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section."

**5.** Section 6 of Pub.L. 280, 67 Stat. 590 (1953), states:
"Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where nec-

other states, including Oklahoma, whose Enabling Acts contained Indian restrictions, required the people of the state to either amend State Constitutions or statutes to remove the impediment. (States which did not have such restrictions were required to give consent by affirmative legislative action. This Section of P.L. 280 was repealed in 1968.)[6] I concur with the majority that *California v. Cabazon Bank of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1986), is not controlling because Oklahoma is not a P.L. 280 state. Therefore, there is no distinction between tribal lands or Indian reservations. Indian Country is Indian Country.

Even assuming that a state constitutional amendment were not necessary the alleged assumption of jurisdiction by individual law enforcement officers and court officials does not constitute a binding exercise of jurisdiction. The states must by affirmative political action express the willingness and the ability to discharge responsibilities in order to make effective the assumption of jurisdiction.[7]

In *Williams v. Lee,* 358 U.S. 217, 222, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959), the Court stated that Congress had expressed its willingness to have states assume jurisdiction over reservation Indians if the state legislature or the people had voted affirmatively to accept such responsibility. It found that Arizona was a disclaimer state because of a provision in its Enabling Act, and that Arizona had not affirmatively accepted jurisdiction. Oklahoma is in the identical situation—thus far no one with

the power and authority has accepted jurisdiction. The Court speculated that the most likely reason for the failure of the people of Arizona to accept jurisdiction was the anticipated burdens accompanying such power.

Conversely, it may be that the disclaimer states have recognized the opportunity for economic development which is offered by locating free trade zones on tribal land, and by acknowledging the beneficial ramifications of cooperation between the states and the sovereign tribes and nations.[8] On May 12, 1988, the Oklahoma Legislature enacted S.B. No. 210, which will be codified as 74 O.S.Supp. 1988 §§ 1221, 1222. Subsections (A), (B), and (C) of § 1221 provide:

A. The State of Oklahoma acknowledges federal recognition of Indian Tribes recognized by the Department of Interior, Bureau of Indian Affairs.

B. The State of Oklahoma recognizes the unique status of Indian Tribes within the federal government and shall work in a spirit of cooperation with all federally recognized Indian Tribes in furtherance of federal policy for the benefit of both the State of Oklahoma and Tribal Governments.

C. The Governor, or his named designee, is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian Tribal Governments within this state to address issues of mutual interest. Such agreements shall become effective upon approval by the Joint Committee on

essary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: Provided, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be."

**6.** Title 25 U.S.C. § 1323 (1983) provides:
"(a) The United States is authorized to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by such State pursuant to the provisions of section 1162 of Title 18, section 1360 of Title 28, or section 7 of the Act

of August 15, 1953 (67 Stat. 588), as it was in effect prior to its repeal by subsection (b) of this section.
(b) Section 7 of the Act of August 15, 1953 (67 Stat. 588), is hereby repealed, but such repeal shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal."

**7.** *Kennerly v. District Court of Montana,* 400 U.S. 423, 427, 91 S.Ct. 480, 482, 27 L.Ed.2d 507, 511 (1971).

**8.** See S.B. 210 (May 12, 1988); Walker, "Report to the Oklahoma Department of Commerce Cultural Diversity and Economic Development Task Force," The Sovereignty Symposium, § 3, p. 7 (1988).

State–Tribal Relations and the Secretary of the Interior or his designee.

I write to express my separate views because in my opinion, the focus on the status of principal-agent is not the controlling factor. Commerce, in the constitutional sense, includes bingo operations because it includes not only traditional commercial dealings, but also intercourse and traffic between the citizens of the United States and the Tribes, in all its branches, the transportation of persons and property for that purpose, as well as the traditional purchase, sale, and exchange of goods, commodities, and services.[9] The determinative issue is whether this activity is a legally constituted tribal enterprise. If it is—the activity is exempt from taxation. A tribal enterprise may be proven by meeting these criteria:

1) Tribal retention of full ownership rights over the land and facility;

2) Ultimate control over the bingo activities;

3) Development of the bingo enterprise by the Tribe;

4) Benefits accruing to the Tribe in the form of profits and employment;

5) Approval of the management contract by the Bureau of Indian Affairs if the tribal charter, constitution or by-laws so provides.[10]

Tribal initiative and managerial decision making result in a more effective implementation of tribal enterprises, and consequently, Indian self determination. A Tribe may fully comply with the stated criteria for exemption by incorporating. The BIA is authorized to issue a charter of incorporation to any tribe applying. The charter conveys comprehensive power to manage and dispose of tribal property subject to the proviso that tribal land within the limits of the reservation may not be leased for periods exceeding ten years. The charter may or may not provide for departmental approval of tribal leases.[11] If the charter does not provide for approval the only limitation is the ten year limit on leasing tribal property. Most charters provide for a trial period during which all tribal leases are subject to departmental approval; this supervision terminates automatically after a specified period.[12] The record does not disclose whether the Pottawatamies are incorporated, and an independent search of documents of which we may take judicial notice [13] does not reveal a corporate charter. Apparently, the tribe is not incorporated and must have the Congressionally mandated BIA approval for all contracts. If this be the case, the management agreement was null and void and

---

**9.** *Philadelphia v. New Jersey,* 437 U.S. 617, 622, 98 S.Ct. 2531, 2534, 57 L.Ed.2d 475 (1978).

**10.** *Indian Country, U.S.A. v. Oklahoma Tax Comm'n,* 829 F.2d 967, 982–83 (10th Cir.1987). See also, Pipestem, "The Mythology of the Oklahoma Indians Revisited: A Survey of the Legal Status of Indian Tribes in Oklahoma Ten Years Later," *The First Annual Sovereignty Symposium,* § VI, p. 60 (1988).

**11.** Title 25 U.S.C. § 503 (1936) provides:
"Any recognized tribe or band of Indians residing in Oklahoma shall have the right to organize for its common welfare and to adopt a constitution and bylaws, under such rules and regulations as the Secretary of the Interior may prescribe. The Secretary of the Interior may issue to any such organized group a charter of incorporation, which shall become operative when ratified by a majority vote of the adult members of the organization voting: Provided, however, That such election shall be void unless the total vote cast be at least 30 per centum of those entitled to vote. Such charter; may convey to the incorporated group, in addition to any powers which may properly be vested in a body corporate under the laws of the State of Oklahoma, the right to participate in the revolving credit fund and to enjoy any other rights or privileges secured to an organized Indian tribe under sections 461, 462, 463, 646, 645, 466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title: Provided, That the corporate funds of any such chartered group may be deposited in any national bank within the State of Oklahoma or otherwise invested, utilized, or disbursed in accordance with the terms of the corporate charter." See also, F. Cohen, Handbook of Federal Indian Law, Chapter 15, p. 287, 329 (1986).

**12.** F. Cohen, Handbook of Federal Indian Law, id.

**13.** Title 12 O.S.1981 § 2201 which provides in pertinent part:
"Judicial notice shall be taken by the court of the common law, constitutions and public statutes in force in every state, territory and jurisdiction of the United States."

thwarted the legal consummation of the attempted tribal enterprise.[14]

The tribe complied with some of the necessary guidelines. It retained the ownership rights over the land and it could purchase the improvements made by EMCI. The tribe received 35% of the bingo profits and 15% of the concessions with a guaranteed monthly income of $10,000.00 a month. Nevertheless, pervasive problems exist which dictate taxation by the state of Oklahoma:

1) EMCI leased the land from the tribe for $12,000.00 a year and subleased the land back to the tribe for $1.00 a year. (*Although these leases were approved by the BIA, the management contract was not* and BIA approval was required because apparently the tribe had not incorporated.)

2) There is no evidence in the record that the tribe is involved in the control of the bingo activities, e.g. gaming ordinances.

3) The management agreement required ECMI to purchase an annual license from the tribe to conduct bingo games. Neither testimony nor a license was presented to support this one factor of control.

Tribes must effectively assume the substantial responsibilities involved in securing and maintaining a tribal enterprise. Apparently, from the evidence presented, the Tribe abdicated its right to control bingo activities, or to participate in the development of the enterprise. Nor did it obtain the necessary BIA approval to meet the federal standards. Had these elements

been met, this activity could constitute a legitimate tribal enterprise and thus invoke tribal immunity from state taxation. Here, the tribal limitation was due more to the omission or oversight of the tribe to follow the Congressional directive, than by federal limitation of power.

Current federal policy is to encourage and foster tribal self-government and to promote economic development.[15] Tribal bingo games have been recognized as one way to support this policy. The Department of Interior has sought to implement these policies by making grants and guaranteed loans to construct bingo facilities, approve tribal ordinances establishing and regulating the gaming activities involved, and by reviewing tribal bingo management contracts under 25 U.S.C. § 81. The Department of Housing and Urban Development and the Department of Health and Human Services also has provided financial assistance to develop tribal gaming enterprises.[16] These policies and actions demonstrate the federal government's approval and promotion of very strong tribal and federal interest in bingo enterprises.

In *Montana v. Blackfeet Tribe*, 471 U.S. 759, 765, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753, 758–59 (1985), the United States Supreme Court held that Montana could not tax the Tribe's royalty interests in oil and gas leases issued to non-Indian lessees under the Indian Mineral Leasing Act of 1938. The Court stated:

> (2) It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs endorsed upon it....
> All contracts or agreements made in violation of this section shall be null and void."

**14.** Title 25 U.S.C. § 81 provides in pertinent part:

"No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands, or to any claims growing out of, or in reference to, annuities, installments or other monies, claims, demands, or thing, under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States, unless such contract or agreement be executed and approved as follows: ...

**15.** *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334–35, 103 S.Ct. 2378, 2386–87, 76 L.Ed.2d 611, 620 (1983); *Cabazon Band v. County of Riverside*, 783 F.2d 900, 904 (9th Cir.1986).

**16.** *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, ——, 107 S.Ct. 1083, 1092–93, 94 L.Ed.2d 244, 253 (1987); *Cabazon Band v. County of Riverside*, see note 15, supra; *Mashantucket Pequot Tribe v. McGuigan*, 626 F.Supp. 245–46 (Conn.1986). See also S.Rep. No. 99–493, p. 5 (1986) and H.R.Rep. No. 99–488, p. 10 (1986).

"In keeping with its plenary authority over Indian affairs, Congress can authorize the imposition of state taxes on Indian tribes and individual Indians. It has not done so often, and the Court consistently has held that it will find the Indians' exemption from state taxes lifted only when Congress has made its intention to do so unmistakably clear."

The United States Supreme Court acknowledged that the federal practice of enforcing tribal immunity from state taxation is very strong, while the corresponding state interest is weak.[17] Here, the Tribe did not meet the requirements for establishing a tribal enterprise.

However, the federal and tribal interests would outweigh the state's interest of taxation had the Pottawatomies complied with the controlling criteria for tax exemption. The majority opinion should not be construed to foreclose exemption from state taxation insofar as tribal bingo enterprises are concerned and it should be limited to the narrow facts of this case.

---

17. *California v. Cabazon Band of Mission Indians,* see note 16, 107 S.Ct. at p. 1091, supra.