## PREMIER INVESTMENT CO. v. WILLIAMS IRON WORKS CO., Inc., et al.

No. 26353. Oct. 20, 1936.

Rehearing Denied Jan. 5, 1937.

Everett Petry, for plaintiff in error.

Warren & Warren, for defendants in error.

PHELPS, J. George B. Orr was lessee under an oil and gas lease covering a quarter section of land. He entered into an agreement with the Premier Investment Company, whereunder that company financed the drilling for oil and gas under said lease, became part owner of the lease, and obtained certain rights of control of the drilling operations thereon.

The Williams Iron Works Company, Inc., performed certain labor in sharpening and repairing tools used in the drilling, and filed its claim against the lease to secure the payment therefor. The Williams Iron Works Company, Inc., obtained a personal judgment against the Premier Investment Company and George B. Orr in the amount of its aforesaid lien claim, and the Premier Investment Company appeals. It is not contended that any contractual relationship existed directly between the investment company and the lien claimant. The judgment against that company was based upon the finding by the trial court that said investment company became a mining partner with the lessee, George B. Orr, and thereby became liable for the payment of the debt. This finding was based upon the terms of the contract itself, plus evidence of certain activities of the investment company beyond the requirements of the contract.

We deem it unnecessary to copy the lengthy contract in this opinion. We have examined it thoroughly, and it appears clear to us that it is not merely a contract of purchase of a part interest in the well or lease, nor is it a mere grubstake contract. By its terms the investment company not only obtained an interest in the lease, but also became a joint operator thereof with Orr to the extent that it actually controlled the drilling of the well at all important stages thereof, and upon the successful completion thereof would recoup five times its outlay in the expense of drilling. The contract provided that the company would pay a certain sum for fuel, a certain sum for supplies necessary in the drilling, and a certain sum for labor, and the disbursement of these sums was in installments as the well progressed, dependent upon Orr's furnishing the company with evidence satisfactory to the company that he had paid bills to date. The company was also to advance further sums of money to cement a surface casing. The payment for fuel and supplies was to be made regardless of whether the well proved productive. Orr was to drill the well on the north half of the quarter section and was to convey to the investment company an undivided half interest in the lease on the south half. Orr was further to assign to the company a stated share of the gross production of oil and gas from the north half. The company was to have the right to be on the premises and observe the drilling of the well and was to be furnished a complete log thereof, and any other information requested as to the progress of the work and the character of the geological formations being encountered as work progressed. It was further provided that in the event any geological formation indicating the presence of oil or gas was encountered, the company was to be notified and have a reasonable time to observe the drilling of that formation, and that no such formation should be drilled to any greater depth than that approved by the company. Thus the company had the power to stop financing the well at a number of stages of the drilling, and the power to say where drilling should stop. It is evident that if in the opinion of the company or its agents it was deemed advisable to stop the drilling at any particular oil-bearing formation or depth, it had that power. It was further provided that Orr could not pledge, sell, or assign the interest retained by him in the well or lease, without the consent of the company, unless he had first repaid to the company the money which it had advanced; but at another place in the contract the company reserved the option to purchase Orr's interest in the lease, if he should desire to sell the same, at the same price offered to him by any other prospective purchaser; and in the event that Orr had an offer of purchase for his interest, he was to notify the company and it would have the right to purchase the interest at the same price as offered by the prospective purchaser. The company had the right to pay off any encumbrances at any time and receive reimbursement from the production of the lease.

The evidence showed that the company advanced the money mentioned in the contract, and, that sum being insufficient, advanced further sums to the total amount of $10,000. The evidence further revealed that the managing agent of the investment company was present very often at the location of the well and that he co-operated with Orr in the actual supervision of having the well drilled.

It is true, as contended by the investment company, plaintiff in error, that the

mere purchase of an interest in a well, or the mere grubstaking of such venture, does not create a mining partnership. But we think that the above recitation of the terms of the contract here reveals that this contract was more than that, and that the contract plus the actual activities of the company in the physical drilling of the well and operation of the lease are clearly such as would constitute it a mining partnership. There are many considerations going into determining whether a mining partnership exists. One of the most important of these (but not necessarily determinating) is the fact or act of co-operation in the drilling or operation of the lease. If the investment company here had simply bought an interest in the lease, we would have before us another question. The investment company did not stop at that, however, but reserved unto itself the absolute power of control of the venture from beginning to end. Its own decision was, as between the parties, the determining factor of whether the drilling should be stopped, or proceeded with, at any important stage in the developments. If an encouraging oil-producing sand was reached, and it became a question of judgment whether to stop there or proceed on deeper, the investment company alone had the power to make such decision.

The company spent $10,000 in addition to the sum provided in the contract. Certainly this was not in consummation of a mere purchase, for under the contract no extra sum was to be advanced by the company, under any contingency.

We think it is unnecessary to discuss this question further. This court has so often defined and discussed the fact situations which prove or negative the existence of a mining partnership that further discussion here would be but repetition. See National Union Oil & Gas Co. v. Richard, 164 Okla. 13, 22 P. (2d) 88; Garber & Pulse, Inc., v. Gloyd, 168 Okla. 88, 31 P. (2d) 947; Thacher v. International Supply Co., 176 Okla. 14, 54 P. (2d) 376; National Oil & Development Co. v. Bible, 177 Okla. 24, 57 P. (2d) 632.

The remaining propositions of plaintiff in error are correct in their pronouncement of the principles of law involved therein, but are inapplicable to the facts of this case. The judgment is affirmed.

McNEILL, C. J., OSBORN, V. C. J., and CORN and GIBSON, JJ., concur.