SPARKS BROTHERS DRILLING CO.,
a Texas Corporation, Appellee,

v.

TEXAS MORAN EXPLORATION
COMPANY, Appellant,

and

J.W. Pump & Supply, Inc., Appellee,

and

Pintex Petroleum Corp.; Sally A. Niver;
Illana Beigleman; Yvonne Wood; Adrienne A. Powell; Glenn F. Thomas;
Raymond E. Cooper, Jr.; John E. Morris; Garth Jones; Homer J. Clark; Ollie Kinney; Hali, Inc.; IMR Oil and
Gas Program; Frank Mahnich; G.
Douglas Pritchard; James H. Etzel;
Arnold S. Leonard; John Edward Shimota; Sheldon I. Greenburg; Dr. Gilbert Zeilder; Jo Ann Thomas; Gatesby
Energy, Inc.; Rick Scrimshire; Evelyn
I. Whaley; Dr. Ronald Barlow; Glenco
Petroleum Corporation; Robert Shimota; Dowell Schlumberger; Incorporated, a Delaware Corporation; Leo Smith
Oil Company; and Howard Drilling
Co., A Partnership, Phillip Howard,
Partner, Defendants.

No. 71214.

Supreme Court of Oklahoma.

Dec. 3, 1991.

Rehearings Denied May 19, 1992.

**952**

Otis C. Shearer, Lemon, Shearer & Ehrlich, Booker, for appellant.

Joe Jackson, Shattuck, for appellee Sparks Bros. Drilling Co.

G.W. Armor, Laverne, for appellee J.W. Pump & Supply.

W. Blank Williamson, Thomas P. Schroedter, Donald S. Smith, Prayer, Walker, Jackman, Williamson & Marlar, Tulsa, for amicus curiae Oklahoma Independent Petroleum Ass'n.

HODGES, Vice Chief Justice.

This case is appealed from a district court decision holding the defendant, Texas Moran Exploration Company (Texas Moran), liable for services and materials furnished in the completion of a well. The dispositive issue is whether Texas Moran was a mining partner of the operator of the well. If a mining partnership exists, then Texas Moran is jointly and severally liable for the costs incurred. *See Oklahoma Co. v. O'Neil*, 440 P.2d 978 (Okla.1968). If there is not a mining partnership, then Texas Moran is severally liable, that is liable only to the extent of its interest in the well. Watts, *Contingent liability of the Passive Working Interest Investor Under Operating Agreements in Oklahoma*, 54 Okla.B.J. 2797 (1983).

The claims in the case arose over a well known as the 1–29 South Otter Creek Prospect (1–29). Texas Moran was the owner of a recorded 25 percent interest in the well. PinTex Petroleum Company (PinTex) was the operator. Texas Moran invested in the 1–29 well after a recommendation from a consultant, J. Spencer Collins (Collins). Collins had also recommended that Texas Moran invest in another well operated by PinTex called the 2–11 Linscott (2–11).

Texas Moran and PinTex first entered into an operating agreement on the 2–11 well. After PinTex did not pay the bills on that well, Texas Moran assumed operation of the well pursuant to the operating agreement. As part of the assumption of the operation of the well, Texas Moran paid off the debts incurred in the drilling of that well.

Meanwhile, Texas Moran employed Collins as a consultant on its possible investment in the 1–29 well. Collins' also represented several other investors in the 1–29 well. Collins' was paid for his services and his employment officially ended when Texas Moran and PinTex agreed on Texas Moran's investment in the 1–29 well.

The operating agreement between Texas Moran and PinTex on the 1–29 well, which was similar to the operating agreement on the 2–11 well, gave each party the right to take its share of the oil and gas in kind and to dispose separately of that share. In two paragraphs, it specifically provided that the parties were severally, not jointly or collectively, liable and that the agreement should not be construed as creating a mining partnership. It also provided that each party was responsible "only for its share of the costs of developing and operating the [1–29] well." The agreement provided that the relationship would be treated as a partnership for tax purposes only.

As to control of the well, the agreement provided that PinTex would have full and direct control of all operations. However, there was a provision providing for an override of this control by the parties "chargeable with the costs" of the operation by a vote of the parties in proportion to their obligations for the costs. This voting control was never exercised.

Sparks Brothers Drilling Company (Sparks), plaintiff, drilled the well. During the drilling, Collins became concerned about the investments of his clients. At

his own expense and after his employment with Texas Moran was ended, he met with Glen Thomas (Thomas), president of Pin-Tex, in Denver. Thomas stated that he consulted Collins about the drilling operations. Collins was not acting for Texas Moran when Thomas allegedly consulted him about the drilling or the completion of the 1–29 well. In fact, J.W. Wood, an officer of PinTex during the initial part of the drilling, testified that Thomas acted "100 on his own initiative and did not consult with anyone to make any decisions about drilling any wells or what he did in the field." And Aubrey Ewing, who was at the 1–29 well location "24 hours a day" never saw anyone from Texas Moran at the site. He did not even know Collins.

Thomas would also report to Collins on the progress of the well. Collins would relay the reports to Texas Moran. In addition to relaying reports to Texas Moran, Thomas gave the other investors daily status reports.

Sparks was paid $20,000 for its services. It is undisputed that Sparks was not paid an additional $66,870 that was properly owed. It is also undisputed that defendant, J.W. Pump & Supply, Inc. (J.W. Pump), furnished casing supplies costing $23,-269.91 that were not paid for. Sparks and J.W. Pump, along with other suppliers, filed liens.

Sparks did not know that Texas Moran was an investor until after it had drilled the well. J.W. Pump did not know that Texas Moran was an investor until after it supplied the casing materials and filed its lien. Neither Sparks nor J.W. Pump relied on any act of Texas Moran or Collins in deciding to drill the well or to supply the casing materials.

The 1–29 well was never productive. When the operator did not pay for the supplies and services, Sparks and J.W. Pump perfected their liens. Sparks brought suit against the operator, Texas Moran, and other working-interest owners seeking a money judgment and against other lien claimants to establish the priority of its lien. J.W. Pump filed a cross-claim for the value of the casing supplies. At the close of Sparks' evidence the district court judge allowed Sparks to amend its petition to include a cause of action against Texas Moran as a mining partner in the 1–29 well and to seek recovery for the unpaid amount owing it. During the proceedings, partial summary adjudications were rendered in favor of J.W. Pump and other lien holders against PinTex and in favor of one of the working-interest owners against Sparks, J.W. Pump and other lien holders. The parties waived a jury trial.

Applying the test for determining the existence of a mining partnership, the district court judge found that PinTex and Texas Moran had agreed to share in the profits and losses, that PinTex and Texas Moran had a joint interest in the property, and that Texas Moran cooperated in the drilling of the 1–29. The judge also found that Texas Moran had a 25% interest in the 1–29 and held Texas Moran liable for the whole amount owing Sparks and J.W. Pump. Texas Moran appealed.

[1, 2] Whether a mining partnership exists must be determined on the facts of each case. *Jenkins v. Pappas*, 383 P.2d 645, 647 (Okla.1963). In every case, the three elements of a mining partnership are: (1) a joint interest in the property, (2) either an express or implied agreement to share in the profits and losses, and (3) cooperation in the project. *Id.*

All parties apparently agree that there is a joint interest in the property. Texas Moran argues that the second prong of the test is missing in the present case. Because we find that the third prong of the test has not been met, we need not address the second prong.

■ This Court has defined cooperation in a project as "actively joining in the promotion, conduct or management" of a project. *Id.* An operating agreement in itself does not create a mining partnership. However, a mining partnership can arise from the behavior of the parties. *Enterprise Mgmt. Consul. v. Tax Comm'n*, 768 P.2d 359, 362 n. 12 (Okla.1989); *Hinson v. Cameron*, 742 P.2d 549, 557 n. 32 (Okla.1987).

Sparks and J.W. Pump point to several acts of Texas Moran, both acting personally and through Collins, which they argue show cooperation. For Sparks and J.W. Pump to show cooperation from the acts of Collins, they must show that Collins was an agent of Texas Moran. They do not argue that Collins was authorized to act as an agent of Texas Moran. Sparks and J.W. Pump do argue that Collins was the apparent agent of Texas Moran when he allegedly advised Thomas about drilling operations.

" 'Apparent authority' of an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing." *Rosser–Moon Furniture Co. v. Oklahoma State Bank*, 192 Okl. 169, 135 P.2d 336, 338 (1943). Three elements must exist before a third party can hold a principal liable for the acts of another on an apparent-agency principal: "(a) conduct of the principal [which would reasonably lead the third party to believe that the agent was authorized to act on behalf of the principal], (b) reliance thereon by [the] third person, and (c) change of position by the third party to his detriment." *Id.* 135 P.2d at 336, 338. In the present case, neither Sparks nor J.W. Wood relied on any acts of Texas Moran or changed positions based on any reliance. Collins was not the apparent agent of Texas Moran in relation to the Sparks and J.W. Pump. Neither Sparks nor J.W. Wood has shown that the acts of Collins should be considered when determining if Texas Moran cooperated in the drilling of the 1–29 well.[1]

The acts of Texas Moran are not sufficient to prove cooperation in the drilling of the 1–29. Receiving reports, questioning bills, hiring a pumper to evaluate the well in contemplation of taking over as operator, and other similar acts are things that any prudent investor would do to protect his investment. *See Jenkins v. Pappas*, 383 P.2d 645 (Okla.1963); *McAnally v. Cochran*, 170 Okl. 368, 46 P.2d 955 (1935).

J.W. Pump relies on *Oklahoma Co. v. O'Neil*, 440 P.2d 978 (Okla.1968), as authority that the acts of Texas Moran showed cooperation. We do not find the facts in *O'Neil* to be comparable to the present facts. However, we find that the case of *Jenkins* is analogous to the present case. In *Jenkins*, the defendant was a member of the operator's board of directors when the drilling project was proposed and accepted, the leasehold interest was in the defendant's name, defendant agreed to pay the operator $2.00 per foot if the well were a dry hole, the defendant had paid a bill of the operator on another lease, and defendant had executed a bond on the well. This court found that the evidence was insufficient to establish a mining partnership.

In the present case, the judgment finding that Texas Moran was jointly liable for the unpaid services and materials provided to the well operator was not supported by the evidence. *See Sparks v. Midland Supply Co.*, 339 P.2d 1056, 1059 (Okla.1959). Therefore, the trial court is reversed. Because the record does not show that the trial court determined the priority of the liens, we remand.

TRIAL COURT'S JUDGMENT REVERSED AND CAUSE REMANDED.

LAVENDER, SIMMS, DOOLIN, ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

OPALA, C.J., and HARGRAVE, J., dissent.

OPALA, Chief Justice, with whom HARGRAVE, Justice, joins, dissenting.

The court concludes the evidence is insufficient to support the trial court's money judgment against a nonoperating working interest owner held jointly liable *qua* mining partner for the unpaid services and materials provided to the well operator. The court's opinion reverses the *nisi prius* decision and remands the cause for a determination of the liens' priority order.

---

**1.** Texas Moran urges that reliance is an element of a mining partnership. While reliance is an integral part of the third prong of the test in this case because of the apparent-agency theory, it is not a fourth and separate element of a mining partnership.

I must recede from the court's pronouncement *which is grounded solely* on the perceived lack of evidence to meet *the third prong of the then-effective common-law test for determining mining partnership status* [1]—i.e., the existence of *cooperation* in the drilling of the well. In my view, competent evidence clearly establishes *every element of the mining partnership test. I would affirm the judgment.*

## I

## THE ANATOMY OF LITIGATION

Texas Moran Exploration Company [Texas Moran] owned a recorded twenty-five percent working interest in the well in suit, known as the 1–29 South Otter Creek Prospect well [1–29]. This company was owned by Patrick Moran, an attorney who, at the time this suit arose, had invested in fourteen to sixteen oil and gas drilling ventures. At the recommendation of its hired consultant, J. Spencer Collins [Collins], Texas Moran purchased an interest in the 1–29 well, which was operated by PinTex Petroleum Company [operator or PinTex]. Collins had also suggested an investment in another PinTex-operated well, the 2–11 West Linscott well [Linscott]. Texas Moran initially invested in the Linscott well and later in the 1–29 well, signing for both transactions essentially the same standard operating agreement used throughout the industry. The agreement recited that the

parties' relationship was to be considered a partnership for tax purposes only. It specifically disclaimed any intent to create a mining partnership or to impose joint liability on the individual investors. The venture's profits and losses were not to be shared by the investors.[2]

Collins' services to Texas Moran officially ended when the company invested in the 1–29 well; his consulting fee was paid in November 1985. Two months later Collins became concerned about the PinTex investments he had recommended and, at his own expense, paid a visit on PinTex personnel at their Boulder, Colorado office. PinTex's president believed that Collins was representing Texas Moran during the Boulder trip.[3] Later Collins was asked to represent Texas Moran at two investors' meetings held to discuss problems which had developed on the Linscott well. According to his testimony, Collins maintained almost daily contact with the operating personnel on the 1–29 well's drilling progress. When Collins was given copies of the electric logs on the well—information not provided to any of the other investors—he marked the logs and forwarded them to Texas Moran. *The 1–29 well operator testified that he believed Collins was representing Texas Moran when he complied with Collins' request to take a core sample—a decision that involved shutting down the drilling on the well.*[4]

---

**1.** For a discussion of the elements in a mining partnership test, *see* Part III of this opinion.

**2.** The agreement specified the participants were to take their share of the production in kind, with each investor individually responsible for marketing his proportionate share, without the investors' sharing in the venture's profits and losses.

**3.** Deposition of J.W. Wood (PinTex President) at 18–19: "Q. Do you know Spencer Collins? A. Yes, I do.... Spencer Collins was an oil and gas man from down in Houston that I met one day in the PinTex office.... Q. Did you ascertain who he was working for? A. I thought he was associated with the Halli Corporation; and with the Pat Moran group in Texas, but I did not know in what capacity. Q. What information did you receive that made you come to that conclusion? A. The fact that the Pat Moran Company and the Halli Corporation bought some of Mr. Thomas' working interest in section

29, and it was during, after they purchased their interest that Mr. Collins was up in the office, and *he discussed that he was representing some people that—in Texas that were investing in section 29.*" (Emphasis added.)

**4.** Deposition of Glenn Thomas (well operator) at 19–20 [Record at 105–106]: "Q. Now, what active participation, if any, did any of the investors have in the drilling operations? A. The only one who made any suggestions whatsoever, and I realized this was because he was an experienced oil man, was Pat Moran, Texas Moran; and he, through his consultant, whose name was ... Collins, J. Spencer. He's a consultant to Texas Moran. Q. What did Mr. Spencer do? A. Spencer is an engineer, petroleum engineer. He went over the electric logs prior to completion.... *He insisted that we core the well during drilling operations, which I did.* Mr. Collins and myself went over and calculated all the electric logs, correlated them with the core data,

Before the 1–29 well's completion, Texas Moran became aware that liens for nonpayment of services and supplies were being filed on the producing Linscott well. Texas Moran *took over the operation of that well* and *paid off the existing liens* when no other investor would assume that responsibility. Pat Moran then sent to the PinTex operator a letter (a) expressing his concern about liens on the Linscott well and (b) stating that he (Moran) would "have to pay off the liens that will inevitably come on South Otter" (the 1–29 well) "due to your shortfalls."

The 1–29 well was never productive. When its debts were not paid by the operator, several oil well supply companies perfected their liens. Because the leasehold estate had little value, the Sparks Brothers Drilling Company [drilling company] brought a lawsuit against the operator as well as Texas Moran and the other nonoperating *working interest owners* (a) to recover a money judgment for unpaid services [5] and (b) to have the priority of its lien established *vis-a-vis* the other lien claimants. The J.W. Pump & Supply Co. [supply company] cross-claimed against the same defendants for the value of the casing furnished. After a jury-waived bench trial money judgment was given to both the plaintiff-drilling company and the defendant/cross-claimant supply company. Applying the tripartite test of *Jenkins v. Pap-* pas [6] for establishing mining partnership status, the trial court found Texas Moran jointly liable with the well operator, *qua* mining partner, for unpaid supplies and services at the well site.

## II

### STANDARD OF REVIEW

When a jury is waived in a common-law case, the trial judge's determination of facts must be given the same force as the verdict of a well-instructed jury. *If any competent evidence supports the nisi prius judgment, it must be affirmed on review.*[7]

## III

### MINING PARTNERSHIP STATUS FOUND FROM THE *CONDUCT* OF THE PARTIES

All the parties litigant appear to rely on the terms of the operating agreement between Texas Moran and the operator as *solely* determinative of Texas Moran's *nonliability as PinTex's mining partner.*

Whether a party stands *vis-a-vis* another in a partnership relation *depends on its status,* which at common law is found from the *surrounding facts* and from the *interaction of the parties* rather than solely from the contract.[8] In case of a discrepancy between facts and contractual provisions, facts control over any contrary provi-

---

and decided where we would perforate, how many sacks of cement we would squeeze before we did the production perforations. *I was in contact with him also, I think, probably every day. I didn't make a move in the field without calling Spencer. I'll put it that way."* (Emphasis added.)

**5.** This constituted but the common-law money judgment prong of the drilling company's larger lawsuit (the latter includes an equitable stage to establish the priority of its lien claim *vis-a-vis* the other claimants) against the operator and nonoperating working interest owners in the 1–29 well.

**6.** Okl., 383 P.2d 645, 647 (1963); *see also* discussion in Part III *infra.*

**7.** *Bradley v. Clark,* Okl., 804 P.2d 425, 427 (1990); *United Engines, Inc. v. McConnell Const., Inc.,* Okl., 641 P.2d 1101, 1102 (1981); *Pracht v. Oklahoma State Bank,* Okl., 592 P.2d 976, 978 (1979); *Acme Glass v. E.V. Cox Const. Co.,* Okl.,

578 P.2d 347, 349 (1978); *Leveridge v. Notaras,* Okl., 433 P.2d 935, 941 (1967); *West v. Independent Sch. Dist. No. 2, McClain County,* Okl., 412 P.2d 185, 188 (1966); *D.W.L., Inc. v. Goodner-Van Engineering Co.,* Okl., 373 P.2d 38, 43 (1962); *Sparks v. Midland Supply Co.,* Okl., 339 P.2d 1056, 1059 (1959); *Smith v. Clark,* Okl., 315 P.2d 960, 962 (1957); *Bullard v. Caulk,* 206 Okl. 353, 243 P.2d 691, 694 (1952); *Continental Supply Co. v. Dickson Oil Co.,* 194 Okl. 660, 153 P.2d 1017, 1020 (1944); *Barron v. Chicoraske,* 189 Okl. 35, 113 P.2d 376, 378 (1941).

**8.** A written contract *alone* may not be taken as conclusive proof of the true status of the parties. Both the effect of the contract's language and the parties' intent must be viewed in conjunction with the *actual conduct of the parties* in order to determine their status *vis-a-vis* one another. *Enterprise Mgmt. Consul. v. State, ex rel. Oklahoma Tax Com'n,* Okl., 768 P.2d 359, 362 n. 12 (1989); *see also Hinson v. Cameron,* Okl., 742 P.2d 549, 557 n. 32 (1987).

sions in the parties' agreement.[9] In order to protect third party creditors, mining partnership status is often *imposed by law* in the absence of a contract or in direct opposition to contractual disavowals of partner relationship.[10] Regardless of the parties' intent, if by their conduct *vis-a-vis* one another they have *in point of law* engaged in a partnership, they may neither deny the relationship nor the liability to third parties that arises from it.[11]

Evidence of Texas Moran's *conduct*, beyond the requirements of or in opposition to disclaimers in the agreement, was the basis of the *nisi prius* ruling that Texas Moran became a mining partner. The liability to third party lien claimants attached from that finding.[12] While the lien claimants may not have detrimentally relied on Texas Moran's status as a partner when they furnished supplies and services for the well, this fact *does not affect their right to recover against one who by its conduct becomes in law a partner in the venture.*[13]

## IV

### THE THREE–PRONG TEST FOR DETERMINING MINING PARTNERSHIP STATUS

The three-prong test for determining mining partnership, first expressed in *Ed-* wards v. Hardwick[14] and more recently in *Jenkins v. Pappas*,[15] requires the presence of three elements: (1) a joint ownership interest in the property; (2) an *express or implied agreement to share in the profits and losses* of the venture and (3) *actions or conduct showing a joint operation or cooperation* in the venture.[16] *None of the parties disagrees that Texas Moran has an ownership interest in the leasehold estate, thus satisfying the first prong of the test.*

### A

### THE EVIDENCE THAT SATISFIES PRONG TWO: THE EXPRESS OR IMPLIED AGREEMENT TO SHARE IN PROFITS AND LOSSES

At issue here is the existence of any conduct by Texas Moran and the operator tending to show an agreement to allocate the losses that might arise from the venture.[17] The trial court found there was an "express or implied agreement between PinTex and Texas Moran to share profits and losses." Texas Moran wrote a letter to the operator indicating that the company would be advancing money, far in excess of the amount agreed to in the parties' contract, in order to pay off the lienable obligations that would be coming due for the 1–29 well expenses. This fact serves as

---

**9.** *Hinson v. Cameron, supra* note 8 at 557, n. 32, quoting *Brewer v. Bama Pie, Inc.*, Okl., 390 P.2d 500, 502 (1964); *Hogan v. State Industrial Com'n*, 86 Okl. 161, 207 P. 303, 304 (1922).

**10.** Boigon and Murphy, Liabilities of Non-operating Mineral Interest Owners, 51 U.Colo. L.Rev. 153, 154 (1980); 3 C. Lindley, A Treatise on the American Law Relating to Mines and Mineral Lands §§ 796–803 (3rd ed. 1914).

**11.** *Mapel v. Long–Bell Lumber Co.*, 103 Okl. 249, 229 P. 793, 795 (1924), quoting *Chapman v. Hughes*, 104 Cal. 302, 37 P. 1048 (1894). *See also* 54 O.S.1981 § 207(1) of the Uniform Partnership Act, which provides in pertinent part:
"In determining whether a partnership exists, these rules shall apply:
(1) Except as provided by Section 16, persons who are not partners *as to each other* are not partners as to third persons. * * * *" (Emphasis added.)

**12.** *Premier Inv. Co. v. Williams Iron Works Co.*, 178 Okl. 579, 63 P.2d 705, 706 (1937).

**13.** *Johnson v. Plastex Co.*, Okl.App., 500 P.2d 596, 598 (1971), quoting *Mapel v. Long–Bell Lumber Co., supra* note 11 at 795. In *Johnson*, at 598, the court noted that it would be "awkward" for sellers to be required to determine all those with an interest in the purchase, apart from the party making the purchase, in order to assure themselves of receiving payment.

**14.** Okl., 350 P.2d 495, 501–502 (1960).

**15.** *Supra* note 6 at 647, quoting *Edwards v. Hardwick, supra* note 14 at 501–502.

**16.** *Jenkins v. Pappas, supra* note 6 at 647; *see also Edwards v. Hardwick, supra* note 8 at 501–502; *McAnally v. Cochran*, 170 Okl. 368, 46 P.2d 955 (1935).

**17.** In *Gottlieb Bros. v. Culbertson's*, 152 Wash. 205, 277 P. 447, 449 (1929), the court noted that one of the most important tests of partnership status is whether there is a sharing of the losses of the venture.

proof of an agreement to share in the venture's profits and losses.[18]

Partnership status may also be proved by *habit and prior course of dealing*, as well as by a partner's conduct and declarations.[19] Evidence of a series of transactions covering several months between two parties engaged in a business in which both have a financial interest is competent to establish the existence of a partnership between such parties.[20] Proof of the course of dealing between alleged partners in reference to *other transactions under the same agreement* and practically contemporary therewith is admissible to show the existence of a partnership.[21] Evidence was admitted of Texas Moran's conduct in the course of activities associated with the Linscott well, which had been drilled in cooperation with PinTex under the same type of agreement as the 1–29 well. There, Texas Moran had been involved in the removal of PinTex as operator of the working interest on the well. Texas Moran's action in *taking over the operation* of the Linscott well and in *paying off its liens* convincingly buttresses the trial court's finding that Texas Moran's conduct evinced an *implied agreement* to allocate the losses of the 1–29 well. These factors amply satisfy the second prong of the mining partnership test.

## B

## THE EVIDENCE THAT SATISFIES PRONG THREE: COOPERATION IN THE PROJECT

Competent evidence supports the finding that Texas Moran, through its apparent agent Collins, cooperated in the project. The existence of an apparent agency must be found from the *conduct or statements of the principal rather than those of the agent.*[22] Texas Moran never disavowed any action taken by Collins after their business relationship had officially terminated. In fact Texas Moran later requested Collins' help and advice on several occasions. Although Texas Moran's owner, an attorney with a graduate degree in law,[23] stated that his business relationship with Collins ended when Collins was paid for his services in locating the 1–29 investment, other witnesses related that Collins continued to represent Texas Moran when he participated in the drilling decisions on the 1–29 well. Collins stated that after his employment had terminated, he communicated with Texas Moran about information he alone had received about well operations. These contacts included marking and sending electric logs to Texas Moran. All the working interest owners received drilling reports, but only Texas Moran had someone at the well site who appeared to be a company representative and received information not included in the drilling reports.

*A settled course of conduct creates apparent authority* for an agent which binds the principal who does not disallow or repudiate the agency in a timely manner, where a third party in good faith relies on the ostensible authority of the agent.[24] The operator testified that Collins was frequently at the well site and maintained daily contact with operating personnel con-

18. *Daily v. Fitzgerald,* 17 N.M. 137, 125 P. 625, 630 (1912).

19. Rowley, Modern Law of Partnership, Vol. 2, § 51.4 at 415 (1961).

20. *Vogel v. Traders' Compress Co.,* 129 Okl. 200, 264 P. 147, 149 (1928).

21. *Martin v. Browder,* 109 W.Va. 542, 155 S.E. 640, 644 (1930).

22. Where the person is the agent of another at the beginning of a transaction, and the principal has a means of knowing that the agent is in some way continuing to act in an agency capacity, it is negligence for the principal not to repu-

diate the agency. *Catlin v. Reed,* 141 Okl. 14, 283 P. 549, 551 (1930); *see also Fisk v. Bullard,* 205 Okl. 502, 239 P.2d 424, 426–427 (1951). The positive testimony of witnesses may be disputed by facts and circumstances, and agency is a fact which may be established by circumstantial evidence.

23. Pat Moran, Texas Moran's owner, testified that after law school he got an L.L.M. [Trial Transcript at 110].

24. *Southwestern Portland Cement v. A.E. Beavers,* 82 N.M. 218, 478 P.2d 546, 549 (1970). A principal whose actions lead the public to believe that his agent has authority to act is bound by his agent's acts *vis-a-vis* any third party who

cerning the drilling progress. He stated that he relied on *Collins' apparent authority* when he complied with his request to suspend drilling in order to core the well, an action going to the heart of the business in which the parties had a joint interest.[25]

## SUMMARY

Competent evidence clearly supports the trial court's determination that Texas Moran met the three-prong *Jenkins*[26] mining partnership test. The record plainly shows that Texas Moran (1) has a joint ownership in the leasehold estate; (2) by its course of action and the pattern of its conduct, displayed a willingness to share in the losses of the venture and (3) through the *apparent agency* of Collins, cooperated in the drilling of the well. Texas Moran's own conduct *vis-a-vis* the well operator made it a partner in the drilling project. Once partnership status developed, Texas Moran's liability to third party claimants attached, *even though the latter may have been unaware of the true relationship.*

I would affirm the trial court's money judgment based on Texas Moran's joint liability with the well operator, *qua* mining partner, for unpaid services and supplies furnished upon the well site.

believes the agent has such authority and deals with him in good faith. *State v. Sellers*, 258 N.W.2d 292, 297 (Iowa 1977).

**25.** *See* Bromberg and Ribstein on Partnership, Vol. 1 § 2.14(4)(ii). In their discussion of *Minute Maid Corporation v. United Foods, Inc.*, 291 F.2d 577 (5th Cir.1961), *cert. denied*, 368 U.S.

928, 82 S.Ct. 364, 7 L.Ed.2d 192 (1961), the authors note that the court allowed plaintiff-Minute Maid to recover from defendant-Cold Storage despite the fact that Minute Maid *was unaware of the partnership relation* between co-defendant United Foods and Cold Storage.

**26.** *Jenkins v. Pappas, supra* note 6.