McWILLIAMS, Senior Circuit Judge.
This is an appeal from a judgment of the United States District Court for the Western *349 District of Oklahoma in a proceeding brought by Bobbie G. Bayless, the trustee of the estate of The Orchard Company, an Oklahoma general partnership, against Christie, Manson & Woods International, Inc., a New York City, New York, domiciled corporation. Jurisdiction of the district court was based upon 28 U.S.C. §§ 157 and 1334, because the proceeding in the district court was directly related to the administration of a bankruptcy estate then pending in the United States Bankruptcy Court for the Western District of Oklahoma. Our jurisdiction is based upon 28 U.S.C. § 158(d).
I.
On September 1, 1983, The Orchard Company (hereinafter Orchard) was formed under Oklahoma law as a general partnership. Pursuant to the partnership agreement, the initial partners consisted of F. Dale Crab-tree, an attorney in Oklahoma City, Oklahoma, his wife, Linda Catherine Crabtree, the David Lynn Crabtree Trust and the Catherine Dianne Crabtree Trust, David Lynn Crabtree and Catherine Dianne Crab-tree being the minor children of F. Dale and Linda Catherine Crabtree. F. Dale Crab-tree will hereinafter be referred to as Crab-tree where appropriate. The partnership was formed for the purpose of acquiring real property located in Newport, Rhode Island, and then leasing or renting the properties thus acquired.
On or about June 4, 1984, Orchard purchased a Pierce August Renoir painting entitled “Vase de Fleurs” (hereinafter the painting) from the Noortman and Brod Gallery in London, England. The invoice for the painting was addressed to Orchard, e/o F. Dale Crabtree, and sent to Crabtree’s law office in Oklahoma City.
By instrument dated January 31,1986, and effective January 1, 1986, F. Dale Crabtree transferred 100% of his partnership interest in Orchard to the children’s trusts in equal shares. By instrument dated June 26, 1986, and effective June 1, 1986, Linda Crabtree also transferred 100% of her partnership interest in Orchard to the children’s trusts in equal shares.
By October 1986, the Crabtree family and Orchard were having financial problems, and at that time, F. Dale Crabtree initiated negotiations with representatives of Christie, Manson & Woods International, Inc. (hereinafter Christie) to sell the painting at one of its art auctions. On or about March 6, 1987, Christie wrote Crabtree, informing him that Christie had received the painting from Noortman and Brod in London and that it would be placed for sale at the next auction. In that letter, Christie enclosed a Consignment Agreement, dated March 6, 1987, in which Crabtree was named as the seller of the painting. On March 13, 1987, Crabtree wrote Christie that Orchard was the “true owner” of the painting and hence “the proper party to authorize the sale and receive the proceeds therefrom,” and in connection therewith requested that the Consignment Agreement be modified to reflect these facts.
On or about March 23, 1987, Christie sent a letter to Crabtree in which it enclosed a revised Consignment Agreement, wherein Orchard was named as the seller. In that letter, Christie stated that the change was made in order to show the “true owner” of the painting. On or about March 30, 1987, George Bailey, as “Trustee, general partner of The Orchard Company,” signed the revised Consignment Agreement.[1] Michael Findlay had signed the revised Consignment Agreement on Christie’s behalf. Paragraph 12 of the revised Consignment Agreement provided as follows:
12. SETTLEMENT' OF ACCOUNT: Provided Christie’s has received payment in full from the buyer, Christie’s will pay Seller the net proceeds received and collected from the sale of the Property thirty-five calendar days after the sale after deducting its commissions, any reimbursable expenses incurred by Christie’s and any other amounts due Christie’s or any of its affiliates (whether arising out of the sale of the Property or otherwise), unless Christie’s shall have received notice of the buyer’s intention to rescind the sale or of any *350 other claim relating to the Property or its sale or shall for any reason have refunded such proceeds to the buyer prior to the expiration of such thirty-five day period.
In an auction held May 12, 1987, Christie sold the painting for $370,000. After deducting its commission and handling charges, Christie remitted the balance of the purchase price to Orchard in the form of a check bearing the date June 19, 1987, and payable to The Orchard Company in the amount of $342,250. In a letter dated June 23, 1987, Crabtree returned the check to Christie. In that letter, addressed to Cyanne Chutkow, an employee at Christie’s, Crabtree, after referring to their telephone conversation of that day, stated that he was enclosing the cheek and asked that in lieu thereof Christie send two certified checks in the amount of $171,-125, one to David Lynn Crabtree and the other to Catherine Dianne Crabtree, addressed to “The Orchard, Narrangansett Avenue, Newport, Rhode Island 02840.”[2]
On June 24, 1987, following Crabtree’s instruction, Christie voided the check made payable to Orchard and in lieu thereof issued two checks, each in the amount of $171,125, one payable to David Lynn Crabtree and the other payable to Catherine Dianne Crabtree. The Crabtree children endorsed these checks and the proceeds were deposited into an account in the name of Crabtree’s mother-in-law, Catherine Adams, in the Rhode Island Hospital Trust Bank.
On December 23, 1987, F. Dale Crabtree, his wife, Linda, the David Lynn Crabtree Trust and the Catherine Dianne Crabtree Trusts, through their trustee at that time, Ralph Cubbler, and Orchard filed a Chapter 11 bankruptcy proceeding. Bobbie G. Bay-less was appointed substitute trustee in the bankruptcy proceeding on June 28, 1988.
It was in this setting that Bayless, as the Trustee for the Orchard estate (hereinafter the Trustee), instituted the present adversary proceeding against Christie on March 22, 1989, in the United States Bankruptcy Court for the Western District of Oklahoma. As above indicated, the complaint filed in Bankruptcy Court was subsequently transferred to the United States District Court for the Western District of Oklahoma for trial.
In her complaint, the Trustee set forth four claims for relief. The first claim was labeled “Fraudulent Conveyance,” wherein it was alleged that Christie’s transfer of the sale proceeds to the Crabtree children “was fraudulent” as to Orchard and constituted a fraudulent conveyance under 11 U.S.C. § 548(a)(2) and 24 Okla.Stat. § 116 (1986). The second claim was for breach of contract, the third claim was for negligence and the fourth and last claim was for conversion.
By answer, Christie denied liability and as an affirmative defense alleged, inter alia, that “[a]ny and all actions of which plaintiff complains were taken by defendant in response to reasonable instructions and requests from a person or persons having actual or apparent authority to act for the plaintiff in the premises.” Christie also filed a third-party complaint against David Lynn Crabtree and Catherine Dianne Crabtree.[3]
II.
Shortly before trial, the Trustee filed on December 2, 1991, a motion for summary judgment on her breach of contract and fraudulent conveyance claims. The district court denied that motion on January 10, 1992, indicating that it believed there was a genuine issue of material fact as to the apparent authority defense. A jury trial there *351 after commenced on February 11, 1992. During the trial, the Trustee voluntarily dismissed her negligence claim, and the district court directed a verdict in favor of Christie on the Trustee’s fraudulent conveyance claim. At the conclusion of all the evidence, the Trustee’s motion for judgment as a matter of law on her breach of contract and conversion claims was denied, and those claims were submitted to the jury, which returned verdicts in favor of Christie on both claims. Judgment pursuant to the jury’s verdicts was duly entered. The Trustee’s post-trial motion for judgment as a matter of law, or, in the alternative, for a new trial, was denied on March 24,1992. The Trustee then filed the present appeal.
III.
On appeal, the Trustee basically advances three grounds for reversal: (1) The district court erred in denying the Trustee’s pretrial motion for summary judgment on her breach of contract and fraudulent conveyance claims;[4] (2) the district court erred in granting, at the conclusion of the Trustee’s evidence, Christie’s motion for a directed verdict on the Trustee’s fraudulent conveyance claim; and (3) the district court erred in denying the Trustee’s trial and post-trial motions for judgment as a matter of law on her breach of contract and conversion claims, and her post-trial motion for a new trial. We elect to first consider the district court’s denial of the Trustee’s post-trial motion for judgment as a matter of law on the breach of contract claim.
A. BREACH OF CONTRACT
An appellate court reviews the denial of a motion for judgment as a matter of law or notwithstanding the verdict de novo. Griffin v. Strong, 983 F.2d 1544, 1546 (10th Cir.1993) (citing First Sec. Bank of Beaver, Okla. v. Taylor, 964 F.2d 1053 (10th Cir.1992)). Under this standard of review, the appellate court finds error in the denial of such a motion “if the evidence conclusively favors the moving party and is susceptible to no reasonable inferences that would sustain the non-moving party’s position.” Whalen, 974 F.2d at 1251 (citing Lucas v. Dover Corp., 857 F.2d 1397, 1400 (10th Cir.1988)).
The jury was instructed by instruction No. 14 that the Trustee was entitled to succeed on her breach of contract claim if she proved the following: (1) the existence of a contract; (2) that Christie “did not fulfill its obligations under the contract in that it paid the painting proceeds to the Crabtree children instead of the Orchard Company”; and (3) the Trustee sustained damage as the result of Christie’s actions. The jury was further instructed that the parties agreed that there was a contract between Orchard and Christie and that accordingly there was no dispute “as to the first element” and that their deliberations should concern only the second and third elements in instruction No. 14. We would parenthetically note that there wasn’t much doubt that Orchard sustained damage and that accordingly only the “second element" really remained for consideration by the jury.
As concerns the second element, it is undisputed that, and this is the starting point, Orchard and Christie entered into a written contract, i.e. the revised Consignment Agreement, which provided that the sale proceeds would be paid to Orchard, and that, notwithstanding the terms of the revised Consignment Agreement, Christie, after first remitting the proceeds of the sale to Orchard, eventually remitted the sale proceeds to David Lynn and Catherine Dianne Crabtree pursuant to instructions received from F. Dale Crabtree to the end that Orchard never received the sale proceeds. Such would seem to establish rather conclusively the “second element” in instruction No. 14 that *352 Christie “did not fulfill its obligation” under the revised Consignment Agreement.
Such being the case, it would appear to us that the real issue is not whether Christie breached its contract with Orchard, which in our view it obviously did, but whether Christie has shown affirmative defenses such as would avoid liability for breaching its contract with Orchard. In this regard, it is Christie’s position that Crabtree had either actual or apparent authority to thus modify the revised Consignment Agreement.[5] In this connection, the jury was instructed, without objection, that Christie had the burden of proving that Crabtree had actual or apparent authority to modify the revised Consignment Agreement. It is the Trustee’s position, as we understand it, that while Crabtree may well have had authority to consign the painting to Christie for sale, once Crabtree informed Christie that Orchard was the “true owner” of the painting, the party to authorize the sale, and the proper entity to receive the proceeds therefrom, and once George Bailey, as general partner and trustee of Orchard, and Christie’s Michael Find-lay signed the revised Consignment Agreement, Crabtree did not thereafter have any authority — be it actual or apparent — to modify the revised Consignment Agreement and direct that the proceeds go to his children in their individual capacities.
B. ACTUAL AUTHORITY
Actual authority invokes the law of agency, and the jury, without objection, was instructed on the subject. As indicated, a party asserting agency has the burden of proof to show the “existence, nature and extent of the agency relationship.” Enterprise Mgmt. Consultants, Inc. v. Oklahoma Tax Commission, 768 P.2d 359, 362 (Okla.1988) (citing Sturm v. Green, Okla., 398 P.2d 799, 804 (Okla.1965); Coe v. Esau, 377 P.2d 815, 818 (Okla.1963)). There is no question that an actual agency relationship existed between Crabtree and Orchard to consign the painting to Christie for sale purposes, which, of course, is exactly what Crabtree did.[6] The present problem is whether Crab-tree had actual authority to modify the revised Consignment Agreement. We reject any suggestion that since Crabtree had actual authority to consign the painting to Christie for sale, such somehow carried with it the actual authority to alter the signed Consignment Agreement between Orchard and Christie and have the sale proceeds remitted to his children individually.
Regarding the extent of Crabtree’s authority, George Bailey testified at length and categorically denied that Crabtree had the authority to modify the signed Consignment Agreement. Bailey stated that when a prior painting owned by Orchard was sold, Crab-tree merely assisted in negotiating the terms of the sale, and the sale proceeds from this first painting were received by Orchard.
For reasons which do not appear in the record on appeal, Crabtree did not testify in the trial of this matter. Crabtree’s actions, however, indicate rather clearly that Crab-tree himself knew that he did not have authority to modify the revised Consignment Agreement. It was Crabtree himself who informed Christie on March 13, 1987, that Orchard was the true owner of the painting and the “proper party to authorize the sale and receive the proceeds therefrom.” In this letter, Crabtree also insisted that the original Consignment Agreement be modified to re- *353 fleet Orchard as the seller and the party to receive the sale proceeds. Based on this information, Christie submitted a revised Consignment Agreement reflecting these changes. And, consistent with Crabtree’s statement that Orchard was the proper party to authorize the sale, George Bailey signed the revised Consignment Agreement in his official capacity as trustee and general partner of Orchard.
Based on Crabtree’s March 13, 1987, letter and the revised Consignment Agreement, Christie cannot assert that it was ignorant of the limitations on Crabtree’s authority. And, “one who deals with an agent knowing that his authority is circumscribed and that the agent’s acts transcends the agent’s powers cannot hold the agent’s principal” liable. State v. West, 796 P.2d 1178, 1180 (Okla.App.1990) (citing Mid-Continent Petroleum Corp. v. Wilhoit, 270 P.2d 645 (Okla.1954)) (relating to a claim of apparent authority) (emphasis added); see also Truscon Steele v. Cooke, 98 F.2d 905, 909 (10th Cir.1938) (citations omitted) (holding that a principal is not hable for the actions of an agent when these actions exceed the agent’s authority and the third-party has knowledge that the agent does not have the authority asserted); Hartford Fire Ins. v. McAvoy, 177 Okla. 60, 57 P.2d 242 (1936) (holding that when an agent has limited authority and informs the third party of this limitation, the principal is not bound by the agent’s actions that exceed that authority).
In the setting described above, Crabtree could not thereafter instruct Christie to not pay the proceeds to Orchard, but to his children, absent some showing that Orchard had given him authority to thus modify the revised Consignment Agreement. Moreover, Christie could not follow Crabtree’s instruction without liability when it had at its disposal the signed, revised Consignment Agreement and Crabtree’s March 13, 1987, letter because
“if a person has means of knowledge reasonably open to him as to the limits of the agent’s authority, he cannot hold the principal unless he uses ordinary diligence to ascertain them, even in those situations in which a principal is . otherwise held although the agent goes beyond his authority. He has means of knowledge if he knows or has reason to know that the authority is evidenced by a document open to and intended for his inspection.”[7]
State v. West, 796 P.2d at 1181 (quoting Restatements 2d of Agency § 167, Comment a (1958)).
Despite Christie’s actual knowledge based on Crabtree’s letter, Christie had a means of determining the extent of Crabtree’s authority through the revised Consignment Agreement itself. Both the revised Consignment Agreement and Crabtree’s March 13, 1987, letter were available for Christie’s inspection. Yet, Christie’s witness, Ms. Chutkow, testified that when Crabtree sought to have the sale proceeds redirected, the Consignment Agreement was not consulted and George Bailey was not contacted.[8] On these facts, Christie proceeded at its peril and cannot now assert that it believed Crabtree had the actual authority to modify the signed, revised Consignment Agreement.
C. APPARENT AUTHORITY
There remains the question of whether there is sufficient evidence to show that Crabtree had apparent authority to modify the revised Consignment Agreement. In this regard, while Crabtree may not have had actual authority to modify the revised Consignment Agreement, actual authority is “not a prerequisite to establishing apparent authority.” Southwestern Bell Media, Inc. v. Arnold, 819 P.2d 293, 294 (Okla.App.1991) *354 (citing Stephens v. Yamaha Motor Co., Ltd., Japan, 627 P.2d 439, 441 (Okla.1981)). Under Oklahoma law, before a third party can hold a principal liable for the acts of an agent on a theory of apparent authority, the third party must show that he changed his position because of his reasonable reliance on the conduct of the principal. Sparks Bros. v. Texas Moran Exploration, 829 P.2d 951, 954 (Okla.1991) (quoting Rosser-Moon Furniture Co. v. Oklahoma State Bank, 192 Okla. 169, 135 P.2d 336, 338 (1943)). In other words, apparent authority cannot be established solely by the conduct of the agent. Wheeler v. Puritan Ins. Co., 720 P.2d 729, 731 (Okla.1986) (citing Stephens, 627 P.2d at 441).
The parties stipulated in the instructions to the jury that “[djuring several months of negotiations, Dale Crabtree was the only individual who directly communicated with Christie’s involving the sale of the subject Painting.” Moreover, Christie’s witnesses testified unequivocally that they had no contact with Bailey regarding a redirection of the proceeds of the sale to Crabtree’s children. Indeed, one of Christie’s witnesses, Michael Findlay, testified that Bailey was unimportant until this lawsuit was filed. Therefore, we perceive nothing in the record to indicate that George Bailey, trustee and general partner of Orchard, did anything which supports Christie’s apparent authority defense.
As this court previously stated in a case involving Kansas law, “[a]n agency does not exist merely ‘because a third person assumed that it existed, nor because the alleged agent assumed to act as such, nor because the conditions and circumstances were such as to make such an agency seem rational and probable....’ ” In re Branding Iron Motel, Inc., 798 F.2d 396, 401 (10th Cir.1986) (citations omitted). In the instant case, neither Crabtree’s actions nor Christie’s assumptions, regardless of how the situation appeared to Christie at the time Crab-tree requested that the sale proceeds be paid to his children, give rise to apparent authority-
IV.
All the evidence indicates that Christie breached the signed revised Consignment Agreement with Orchard. In our view, there is literally no evidence that Bailey bestowed actual or apparent authority on Crabtree to modify the revised Consignment Agreement and divert the sale proceeds from Orchard to Crabtree’s children. “Where facts relied upon to establish the existence of the agency are undisputed and no conflicting inferences may be drawn therefrom, the question of whether an agency exists is one of law for the court.” Mitchell v. Ford Motor Credit Co., 688 P.2d 42, 46-47 (Okla.1984) (citing Keel v. Titan Construction Corp., 639 P.2d 1228, 1230 (Okla.1982)). Accordingly, the district court erred in denying the Trustee’s post-trial motion for judgment as a matter of law on her breach of contract claim.
In view of the foregoing, we deem it unnecessary to consider the other matters urged on appeal by the Trustee as grounds for reversal. The judgment is reversed, and the case is remanded with direction that the district court enter judgment in favor of the Trustee in the amount of $342,250 on her breach of contract claim against Christie.[9]

. George Bailey became trustee of both of the children’s trusts on May 9, 1986, and later resigned that position on September 4, 1987. Ralph Cubbler became the new trustee.

. As indicated, the first check was payable to Orchard, and the envelope containing the check was addressed to Orchard. At this point in time. Orchard apparently had its office across the hall in the same building as Crabtree’s law office. In any event, the check somehow came into Crab-tree’s possession and Crabtree apparently attempted to "endorse” the check by using Orchard’s address stamp. Unsuccessful in so negotiating the check, Crabtree marked through the address stamp and returned the check to Christie in his letter of June 23, 1987.

. Christie’s third-party complaint was dismissed by the district court on February 13, 1992, on motion by the third-party defendants. It would appear, though it is not certain, that Christie’s third party complaint against the Crabtree children was dismissed after the jury returned a verdict in favor of Christie on the Trustee’s claims against Christie. In any event, the third-party defendants, the Crabtree children, are not parties to the present appeal.

. The Trustee contends- that she can appeal the district court's denial of her pretrial motion for summary judgment on her breach of contract and fraudulent conveyance claims. This court has held “that even if summary judgment was erroneously denied, the proper redress would not be through appeal of that denial but through subsequent motions for judgment as a matter of law (‘JAMOL’) and appellate review of those motions if they were denied.” Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1251 (10th Cir.1992), cert. denied, - U.S. -, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993) (footnote omitted).

. Alternatively, Christie contends that Orchard, acting through Bailey, ratified payment to the Crabtree children. At trial the jury was instructed that actual or apparent authority were defenses to the Trustee’s breach of contract and conversion claims, and that ratification was a defense to the conversion claim. Since this court finds, as articulated below, that Christie breached its contract with Orchard, and that there is insufficient evidence to show either actual or apparent authority to modify the revised Consignment Agreement, we need not review the conversion claim or the affirmative defense thereto of ratification.

. The existence of an agency relationship based on actual authority can arise by express authorization or by implied authorization. Curtis v. CIA Machinery, Inc., 571 P.2d 862, 865 (Okla.App.1977) (citing Farmers Nat’l Grain Corp. v. Young, 187 Okla. 298, 102 P.2d 180 (1940)). The existence of an agency relationship arises, regardless of the parties’ intent, when “two parties agree that one is to act for the other, or the conduct of the parties is such that it demonstrates the willingness of one to act for the other." Haworth v. Central Nat’l Bank of Oklahoma City, 769 P.2d 740, 743 (Okla.1989).

. In view of Crabtree’s earlier insistence that the original Consignment Agreement be changed to show Orchard as the seller and the one entitled to the sale proceeds, it is doubtful that Christie acted "reasonably” in paying the proceeds to the Crabtree children, without any inquiry of Bailey, the signatory for Orchard on the revised Consignment Agreement.

. The third page of the signed, revised Consignment Agreement provided space for the consign- or to identify someone other than itself to receive the sale proceeds. Orchard left this space blank.

. The jury was instructed that if it found in favor of the Trustee, it should award damages in the amount of $342,250.